**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, AMERICAN COUNCIL ON EDUCATION, ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES, BRANDEIS UNIVERSITY, BROWN UNIVERSITY, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, THE CALIFORNIA INSTITUTE OF TECHNOLOGY, CARNEGIE MELLON UNIVERSITY, THE UNIVERSITY OF CHICAGO,  CORNELL UNIVERSITY, THE GEORGE WASHINGTON UNIVERSITY,  JOHNS HOPKINS UNIVERSITY, MASSACHUSSETS INSTITUTE OF TECHNOLOGY, TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF ROCHESTER, and TRUSTEES OF TUFTS COLLEGE, | |
| Plaintiffs, | Case No. _____ |
| v. | **COMPLAINT** |
| DEPARTMENT OF HEALTH & HUMAN SERVICES, | |
| NATIONAL INSTITUTES OF HEALTH, | |
| DOROTHY A. FINK, M.D. in her official capacity as Acting Secretary, Department of Health and Human Services, and | |
| MATTHEW J. MEMOLI, M.D., M.S. in his official capacity as Acting Director, National Institutes of Health, | |
| Defendants. | |

1.      This suit challenges a flagrantly unlawful action by the National Institutes of Health ("NIH") and the Department of Health and Human Services ("HHS") that, if allowed to stand, will devastate medical research at America's universities.  Cutting-edge work to cure disease and lengthen lifespans will suffer, and our country will lose its status as the destination

for solving the world's biggest health problems.  At stake is not only Americans' quality of life, but also our Nation's enviable status as a global leader in scientific research and innovation.

2.    In addition to being a disaster for science, NIH's action is an affront to the separation of powers.  When the executive previously attempted to accomplish what the February 7th directive purports to mandate, Congress exercised its constitutional power of the purse and forbade the executive from expending appropriated funds on trying to do so again.  Yet NIH defied Congress' express directives as to this core congressional power and issued the February 7th directive anyway—and NIH will continue to violate Congress's express commands so long as the directive remains in force.

3.    For decades, universities have built their research institutions on NIH's commitment to fund the costs of the research it supports.  Some of those costs are "direct"; that is, they are readily attributable to specific projects.  Others are "indirect"; that is, they are necessary for the research to occur but harder to attribute to individual projects.  Biocontainment laboratories needed for pathogenic research; blood banks and animal facilities for clinical testing; computer systems to analyze enormous volumes of data; information-technology and utility systems providing the backbone for those efforts; and researchers and administrative staff who keep the systems running—all are critical to cutting-edge research, but their costs typically cannot be allocated to any single project.  Because of caps on administrative costs, moreover, universities contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants.

4.    Congress understood that NIH would "make grants-in-aid to universities" via a bespoke process accounting for each institution's unique cost structures and grants.  42 U.S.C. § 241(a)(3).  That is *why* Congress gave the executive branch the quintessentially administrative

task of identifying institution-specific metrics and did not itself set across-the-board metrics. Hence, the Office of Management and Budget ("OMB") exercised its authority to promulgate regulations requiring agencies like HHS and NIH to negotiate indirect cost rates with individual financial assistance recipients through a carefully regulated process, based on each institution's unique needs and cost structure. *See* 31 U.S.C. § 503(a), (b)(2)(C) (empowering OMB to "establish governmentwide financial management policies for executive agencies," including as to "grant[s]"). By regulation, this negotiation yields a rate that is intended to reflect the *actual*, *verified* indirect costs incurred by the institution. Audits ensure that the negotiated rate tracks actual indirect costs.

5.      The purpose of this process is to ensure that the negotiated rate correctly captures the actual indirect costs incurred in the conduct of research. Differences in indirect cost rates do not reflect undeserved government subsidies; rather, institutions have different indirect cost rates because they engage in different types of research and have unique mixes of fixed and variable institutional costs that are appropriately allocated across multiple research projects or other cost objectives. Government funding agencies may deviate from the negotiated rates only in limited circumstances, and only via procedures that provide ample notice and protections to ensure that the basic terms of engagement are not changed precipitously. The regulatory framework thus recognizes that there is no one-size-fits-all approach and that participating institutions have profound reliance interests in the negotiated rates—rates that are tailored to their circumstances and that facilitate the work that makes the United States a world leader in cutting-edge research.

6.      This is not the first time an administration has considered limiting indirect cost rates and superimposing a one-size-fits-all regime on what has long been a tailored, negotiated process. In 2017, the Administration proposed slashing the indirect cost rate to 10% for all NIH

grants.  Congress' reaction was immediate and explicit: Congress enacted an appropriations rider providing that regulatory "provisions relating to indirect costs . . . including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017."  Consolidated Appropriations Act, 2018, § 226, Pub. L. No. 115-141, 132 Stat 348, 740.  The appropriations rider further prohibits HHS or NIH from spending appropriated funds "to develop or implement a modified approach to" the reimbursement of "indirect costs" and "deviations from negotiated rates."  *Id.*  Congress has repeatedly reenacted that rider in the appropriations laws governing HHS, including the now-operative statute.  *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677.

7.    In direct defiance of these statutes, and in flagrant disregard of the reliance interests they aim to protect, NIH issued guidance[1] (the "Guidance") on Friday, February 7, 2025 that purports to overturn its decades-long approach to funding research with no advance warning or exceptions for existing grants.  Effective Monday, February 10, 2025, the Guidance immediately lowers indirect cost rates to 15% across the board for all institutions receiving funding from NIH—and for institutions of higher education, applies to new and existing grants alike.  The Guidance does not even acknowledge the statutes that expressly prohibit NIH from taking this step.  And the Guidance makes no serious attempt at compliance with the Administrative Procedure Act: The Guidance ignores all the obvious ways that its unprecedented change will thwart its stated goal that the "United States should have the best medical research

---

[1] Office of The Director, National Institutes of Health, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html.

in the world"; does not acknowledge the reliance interests that this unannounced step subverts; and rests on a facile comparison between NIH grants and those from private foundations (which often fund different types of research and, in all events, presuppose government funding).

8.      The effects will be immediate and devastating.  Medical schools, scientific research institutes, and other grant recipients across the country have structured their programs and development of physical infrastructure assuming that the substantially higher indirect cost recovery rates would remain in place, and that any changes to those rates would be based on actual changes in cost.  The rates were negotiated with the relevant federal agency through a well-understood legal process and in reliance on NIH's longstanding approach.  Even at larger, well-resourced institutions, this unlawful action will impose enormous harms, including on these institutions' ability to contribute to medical and scientific breakthroughs.  Smaller institutions will fare even worse—faced with more unrecoverable costs on every dollar of grants funds received, many will not be able to sustain any research at all and could close entirely.  In a public statement, the Council on Governmental Relations has already called this brazen act "a surefire way to cripple lifesaving research and innovation."[2]  As the Guidance acknowledges, NIH's work—and the work of research institutions that receive NIH funding—serves to "enhance health, lengthen life, and reduce illness and disability."  NIH's extraordinary attempt to disrupt all existing and future grants not only poses an immediate threat to the national research infrastructure but will also have a long-lasting impact on the country's research capabilities, and in turn, its ability to deliver positive outcomes for all Americans and individuals around the world.

9.      America's rivals will cheer the decline in American leadership that the Guidance threatens.   But that decline should not occur—because well-established principles of

---

[2] David Malakoff, *NIH Slashes Overhead Payments for Research, Sparking Outrage*, Science (Feb. 7, 2025), https://www.science.org/content/article/nih-slashes-overhead-payments-research-sparking-outrage.

constitutional and administrative law require setting the Guidance aside.  The Guidance violates

not just Congress's express directives in the appropriation acts governing the NIH, but also

HHS's own regulations that prohibit NIH from wreaking such destructive and reliance-destroying

changes, as well as the Administrative Procedure Act and basic principles of reasoned decision-

making and fair process.

## JURISDICTION AND VENUE

10.    This action arises under the Administrative Procedure Act (APA), 5 U.S.C.

§§ 701-706; the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat.

460; and regulations governing federal grants.  This Court has subject matter jurisdiction pursuant

to 28 U.S.C. § 1331 and the APA.

11.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants

are agencies of the United States and officers of the United States acting in their official capacity,

and a substantial part of the events or omissions giving rise to the claims occurred in this District,

and several Plaintiffs reside in this district.

## PARTIES

12.    Plaintiff Association of American Universities ("AAU") is an association

composed of 71 leading research universities with the goal of transforming lives through

education, research, and innovation.  AAU's member organizations are public and private

research universities that are world-renowned centers of scientific and technological research and

innovation.  Much of their scientific work is supported by NIH grants.

13.    Plaintiff Association of Public and Land-Grant Universities ("APLU") is a

membership organization that fosters a community of university leaders collectively working to

advance the mission of public research universities.  A core mission of the APLU is fostering

research and innovation, specifically by "promoting pathbreaking scientific research."[3] The association's membership consists of over 200 research universities, land-grant institutions, and affiliated organizations across the United States.  Much of their scientific work is supported by NIH grants.

14.    Plaintiff American Council on Education ("ACE") is a nonprofit association composed of more than 1,600 colleges, universities, and higher education-related associations, organizations, and corporations with the goal of enabling higher education institutions to flourish. ACE's member organizations are accredited, degree-granting colleges and universities, as well as related associations, organizations, and corporations that also serve as world-renowned centers of scientific technological research and innovation.  Much of their scientific work is supported by NIH grants.

15.    Plaintiff Brandeis University ("Brandeis") is a private university located in Waltham, Massachusetts.  Brandeis is dedicated to making groundbreaking discoveries and providing first-rate educational opportunities. Brandeis faculty have been recognized for moving their fields forward with exceptional distinctions, including: Nobel Prize winners; fellowship in the American Academy of Arts and Sciences; membership in the National Academy of Sciences and the National Academy of Medicine; Pulitzer Prizes; MacArthur Foundation "genius grants"; and Howard Hughes Medical Institute investigatorships.  Brandeis conducts meaningful research at the leading edge of the scientific, technological, and medical fields through its world-renowned labs, centers, and institutes.  NIH is a key sponsoring agency of the Division of Science at Brandeis, which receives NIH funds for a critical number of individual research grants.

---

[3] Association of Public and Land-Grant Universities, *About Us*, https://www.aplu.org/about-us/.

16.     Plaintiff Brown University ("Brown") is a private university located in Providence, Rhode Island.

17.     Plaintiff the Regents of the University of California ("UC") is the board of regents of the University of California system, and is located in Oakland, California.

18.     Plaintiff the California Institute of Technology ("Caltech") is a private university located in Pasadena, California.  Caltech is a world-renowned science and engineering research and education institution, where world-leading faculty and students work collaboratively across disciplines to address fundamental scientific questions, develop cutting-edge technologies, advance innovation, and expand the horizon of human knowledge to transform our future. Caltech leads research in areas such as neuroscience, biology and health, quantum science and engineering, advanced computing and artificial intelligence, and planetary and earth science. To date, 47 Caltech alumni, faculty, and postdoctoral scholars have won a total of 48 Nobel Prizes for discoveries including the role of chromosomes in heredity, the enabling of machine learning with artificial neural networks, directed evolution, and the first detection of ripples in spacetime. Caltech has approximately 300 professorial faculty and approximately 600 research scholars. The mission of Caltech is to expand human knowledge and benefit society through research integrated with education.

19.     Plaintiff Carnegie Mellon University ("CMU") is a private university located in Pittsburgh, Pennsylvania.  A leading research institution and global leader in computer science, engineering, robotics, the arts and design, CMU fosters and supports groundbreaking interdisciplinary research that impacts society in transformative ways. Across approximately 190 active research awards from the NIH, CMU researchers are developing and deploying solutions

to advance human health and improve lives in areas such as corneal blindness, artificial lungs, spinal paralysis, and Parkinson's disease.

20.    Plaintiff the University of Chicago ("UChicago") is a private university located in Chicago, Illinois.  UChicago is a leading academic and research institution driving field-defining research that produces new knowledge and breakthroughs with substantial impact.  NIH funding supports UChicago faculty, researchers, and students to make critical advancements in patient care including for diabetes prevention and treatment in children and adults, the treatment of celiac disease and advanced metastatic prostate cancer, and cognitive resilience in aging.

21.    Plaintiff Cornell University ("Cornell") is a private university located in Ithaca, New York.  Cornell is a world-class research institution "dedicated to discovery and translating that discovery to benefit the public in all aspects of American life."[4]  Faculty and researchers at Cornell have significant NIH portfolios, as described below.

22.    Plaintiff the George Washington University ("GWU") is a private university located in the District of Columbia.

23.    Plaintiff Johns Hopkins University ("JHU") is a private university located in Baltimore, Maryland.

24.    Plaintiff Massachusetts Institute of Technology ("MIT") is a private university located in Cambridge, Massachusetts.  As a major research institution, MIT contributes significantly to the development of modern science and technology.  MIT receives important federal funding from the NIH, such as an active $2.8 million grant to the Picower Institute for Learning and Memory for research into a new approach to combat Alzheimer's disease and an ongoing

---

[4] Cornell University, *On Yesterday's NIH Announcement* (Feb. 8, 2025),
https://statements.cornell.edu/2025/20250208-on-nih-announcement.cfm.

Cancer Center Support Grant from the National Cancer Institute to the Koch Institute for Integrative Cancer Research.

25.     Plaintiff Trustees of the University of Pennsylvania ("Penn") is a private university located in Philadelphia, Pennsylvania.

26.     Plaintiff University of Rochester ("Rochester") is a private university located in Rochester, New York.

27.     Plaintiff Trustees of Tufts College ("Tufts") is a private university located in Medford, Somerville, Grafton, and Boston, Massachusetts.  Tufts is a premier research institution that conducts research through several nationally recognized institutions that engage in vital, cutting-edge medical research that benefits millions of Americans.  NIH has funded numerous impactful projects at Tufts, including as part of the Center for Integrated Management of Antimicrobial Resistance, which conducts research to protect humanity from the global threat of drug-resistant microorganisms.

28.     Defendant Department of Health and Human Services ("HHS") is an executive department of the federal government that is responsible for protecting the health of the American people and providing human services.

29.     Defendant NIH is a component of HHS that is responsible for biomedical and public health research.

30.     Defendant Dorothy Fink is Acting Secretary of HHS.  She is sued in her official capacity.

31.     Defendant Matthew Memoli is the acting Director of NIH.  He is sued in his official capacity.

## FACTUAL BACKGROUND

### A. Indirect Cost System Structure

32.    The United States government has a strong interest in funding medical research on behalf of the American people.  To further this mission, the federal government awards billions of dollars to research universities, as these universities are able to most effectively further NIH's goal.

33.    NIH is the primary source of federal funding for medical research in the United States.  In Fiscal Year 2023, NIH spent over $35 billion on almost 50,000 competitive grants to more than 300,000 researchers.

34.    NIH grants have funded medical research that has led to innumerable scientific breakthroughs, ranging from the Human Genome Project to the development of the MRI to the discovery of treatments for cancers of all types.  Dozens of NIH-supported scientists have earned Nobel Prizes for their groundbreaking scientific work.

35.    Most NIH-funded research occurs at outside institutions, including universities. This approach allows NIH to fund a wide array of institutions, promote competition for research grants, and facilitate the training of the next generation of researchers.

36.    NIH pursues its research goals by funding the organizational Plaintiffs' member universities' and the university Plaintiffs' critical medical research.  At any given time, individual research universities often depend on thousands of NIH grants that support independent research projects across multiple university departments and centers.

37.    These NIH grants are issued pursuant to a well-established legislative and regulatory framework.  Congress has authorized NIH to "make grants-in-aid to universities" for research support.  42 U.S.C. § 241(a)(3).  Congress also instructed OMB to issue general guidance

on fiscal administration issues, including grants.  *See* 31 U.S.C. § 503(a), (b)(2)(C) (empowering OMB to "establish governmentwide financial management policies for executive agencies," including as to "grant[s]").  In turn, OMB has established uniform guidance for agencies to administer grants under the agencies' purview.  *See* 2 C.F.R. pt. 200 (setting forth "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards").  And agencies like HHS and NIH have incorporated OMB's guidance into their own regulations.  *See* 45 C.F.R. pt. 75 (setting forth "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards").

38.    As provided by NIH's regulations, NIH's competitive grantmaking process begins with a notice of funding opportunities for a specific topic followed by new application submissions.  Nat'l Inst. of Health, U.S. Dep't of Health & Hum. Servs., *NIH Grants Policy Statement* I-51 (rev. April 2024), https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf ("Policy Statement"); *see* 45 C.F.R. § 75.203.

39.    After a formal review process that includes peer review, the NIH issues a legally binding Notice of Award ("NOA") to selected grant recipients stating that funds may be requested (i.e., drawn down) from the agency.  Policy Statement at IIA-59; *see* 45 C.F.R. § 75.210(a)(6) (establishing that the award must include the "[a]mount of [f]ederal [f]unds [o]bligated by this action").  An NOA is issued for the initial budget period and each subsequent budget period, and it reflects any future-year understandings about the continuation of the funded project.  Policy Statement at IIA-59.

40.    Federal grant recipients generally do not receive lump-sum grants.  Instead, they use cost-based accounting systems under which they first incur expenses and then recover their actual, documented costs for conducting research.

41.     The costs of conducting NIH-funded research come in two types.  The first is "direct costs"—costs that can be attributed to a specific research project.  For example, the salary of a graduate student assigned to a particular research project, or the cost of a specialized piece of equipment purchased for a research project is a direct cost.

42.     The second is "indirect costs"—costs that are necessary for research but that support multiple research projects.  These costs have long been reimbursed as part of federal grant funding: in 1962, Congress authorized the use of "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions.  Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437

43.     "[I]ndirect costs" are comprised of "[f]acilities" and "[a]dministration" costs.  45 C.F.R. § 75.414(a).  The "[f]acilities" category is "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." *Id.*  This category includes the costs of the physical infrastructure necessary for carrying out research, such as construction and maintenance of buildings, including specialized facilities and laboratories.  Those costs are indirect because a single building might house numerous research groups engaged in multiple distinct projects.

44.     The "[a]dministration" category is defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'"  45 C.F.R. § 75.414(a).  This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as human and animal research review boards, financial reporting and purchasing, and managing potential conflicts of interest.  These are indirect costs

because a single employee or group of employees will handle these necessary administrative activities across multiple NIH grants.  Because of caps on administrative costs, moreover, universities contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants.

45.    Federal regulations require research institutions to express their indirect costs as a rate that is multiplied by the cost of each individual research grant associated with those costs. *See* Appendix III to Part 75—Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs).  This methodology ensures that indirect costs are allocated fairly across supported projects, with the more expensive and resource-intensive research projects being allocated a larger share of indirect costs.  As a simplified example, suppose a single laboratory houses two research projects—one funded by an annual $75,000 grant and one funded by an annual $25,000 grant.  Suppose, too, that the laboratory's sole indirect cost is the cost of electricity, which costs $10,000 per year.  Because the cost of electricity ($10,000) is 10% of the total grant amount ($100,000), the indirect cost rate would be 10%.  Thus, $7,500 of electricity costs would be allocated to the first project, and $2,500 of electricity costs would be allocated to the second project.

46.    Federal regulations prescribe a detailed methodology for negotiating indirect cost rates.  *See* Appendix III to Part 75—Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs).  Typically, a single agency, such as HHS, negotiates an indirect cost rate with an institution.  That indirect cost rate then applies to all of that institution's grants across the entire federal government.  Federal regulations require institutions to conduct and submit to their federal agency comprehensive cost analyses that follow detailed federal cost accounting guidelines governing reasonable and allowable indirect costs.

For example, if an institution seeks to recover the cost of building maintenance, it must document those costs and then allocate those maintenance costs across research and non-research programs.

47.    The federal agency then reviews and verifies these proposals and determines the institution's indirect cost rate.  Again, this rate reflects actual, verified costs incurred by the institution.

48.    Once the federal agency agrees to an indirect cost rate, it binds the entire federal government during the period that the negotiated rate is in effect.  Typically, the negotiated rates remain in effect for one year, although in some cases they remain in effect for up to four years.

49.    After the costs are incurred, federal agencies conduct audits to ensure that the negotiated indirect cost rate conforms to the actual indirect costs that were incurred.  The indirect cost rate can be adjusted if the audit establishes that the institution has recovered excess costs.

50.    NIH is required to use that negotiated indirect cost rate unless a deviation therefrom "for a class of Federal awards or a single Federal award" is "required by Federal statute or regulation" or is "approved by a Federal awarding agency head or delegate based on documented justification as described in [45 C.F.R. § 75.414(c)(3)]."  45 C.F.R. § 75.414(c)(1).

51.    The cross-referenced provision, 45 C.F.R. § 75.414(c)(3), in turn makes clear that the negotiated rates remain the baseline and that it authorizes only specific "deviations" for individual awards or classes of awards when specified criteria are met.  In particular, that provision specifies that "[t]he HHS awarding agency must implement, and make publicly available, the policies, procedures and general decision making criteria that their programs will follow to seek and justify deviations from negotiated rates."  45 C.F.R. § 75.414(c)(3).

52.    Any such deviation can only apply prospectively.  Pursuant to 45 C.F.R. § 75.414(c)(4), "the HHS awarding agency must include in the notice of funding opportunity the

policies relating to indirect cost rate reimbursement, matching, or cost share as approved." Moreover, "the HHS agency should incorporate discussion of these policies into their outreach activities with non-Federal entities prior to the posting of a notice of funding opportunity." *Id.*

53.    The NIH Grants Policy Statement ("Policy Statement") sets out for NIH grant recipients "the policy requirements that serve as the terms and conditions of NIH grant awards." Policy Statement at ii.  Regarding reimbursement of indirect costs, the Policy Statement confirms that these rates are to be negotiated with one of several "agenc[ies] with cognizance for F&A/indirect cost rate (and other special rate) negotiation."  Policy Statement at IIA-68.

54.    Section 7.4 of the Policy Statement also provides: "Regardless of the type of recipient, the rate(s) in effect at the beginning of the competitive segment will be used to determine the amount budgeted for F&A costs for each year of the competitive segment." Further, "F&A cost reimbursement on grants to IHEs is based on the rates used in the award, which are not subject to adjustment in reimbursement except for the establishment of permanent rates when a provisional rate was used for funding (See 2 CFR 200 Appendix III Section C(7)(b))."  Policy Statement at IIA-69.

55.    Negotiated rates vary significantly from institution to institution.  The primary reason for this variation is that different institutions conduct different types of research.  Scientific laboratories tend to be far more expensive to build and maintain than generic office buildings. As such, an institution engaging in biomedical research will likely have a higher indirect cost rate than an institution primarily engaged in social science research.  Even in the context of biomedical research, some types of research are more expensive than others.  If a particular institution invests in an expensive piece of advanced lab equipment that supports multiple lines of research, that

institution will have higher indirect cost rates than a different institution that does not use expensive lab equipment or uses such equipment for only one research project.

56.    Institutions with higher-than-average negotiated indirect cost rates are typically those that support facility-intensive types of research, including: biocontainment laboratories that support immunology, virology, and microbiology research involving dangerous biological pathogens; animal facilities; and resources to support genomic, proteomic and metabolomics analysis and processing.

57.    Local conditions may also affect indirect cost rates. The costs of construction, renovation, utilities, and wages vary significantly by region. The variations in rate are also influenced by the extent to which different institutions subsidize some of the otherwise direct costs.

B. **Plaintiffs' Prior Indirect Cost Funding**

58.    Plaintiffs and Plaintiffs' member universities earn the majority of competitively awarded federal funding for research.

59.    Plaintiffs and Plaintiffs' member universities have negotiated indirect cost rates above 15%.

60.    Plaintiff Brandeis—a member of AAU and ACE—was awarded approximately $37 million in NIH funding for Fiscal Year 2024, spread across 90 different awards. Brandeis's negotiated indirect cost rate is approximately 60%, which amounts to approximately $11 million in indirect cost recovery annually. Brandeis has relied on the well-established process for negotiating grant funding to prepare its operating budget. The Guidance's reduction would eliminate $7.5 million in indirect cost recovery on an annual basis.

61.     Plaintiff Brown—a member of AAU and ACE—receives significant federal funding from NIH—including approximately $37 million in indirect costs in fiscal year 2024, and to date, $22 million in indirect costs in fiscal year 2025.  If the 15% indirect cost rate had applied in fiscal year 2024, Brown would have experienced a loss of approximately $27 million, and if it applies for fiscal year 2025, Brown would experience a loss of approximately $16 million.

62.     Plaintiff UC—a member of AAU, ACE, and APLU—receives significant federal funding from NIH—over $2 billion in NIH contract and grant funding in fiscal year 2023, a significant portion of which was derived from facilities and administrative cost reimbursements at a higher negotiated rate than 15%.

63.     Plaintiff Caltech—a member of AAU and ACE—receives significant federal funding from NIH—it expended approximately $ 79 million in fiscal year 2024, and the indirect costs constituted approximately 30.5% of the total cost.

64.     Plaintiff CMU—a member of AAU and ACE—receives substantial funding from NIH annually.  Currently, CMU has 189 active research awards from NIH, totaling approximately $136.9 million in funding.  In Fiscal Year 2024, CMU's expenditures on those awards were $52 million, of which $11.7 million were in indirect costs.  Over the next five years, CMU expects to receive an average of $57 million from NIH annually for direct costs; based on its negotiated indirect cost recovery rate of approximately 52%, CMU expects to recover around $12 million annually in indirect costs for the next five years.  CMU has relied on the well-established process for negotiating indirect cost rates with the government to inform its budgeting and planning.  If the indirect cost recovery rate is fixed at 15%, CMU's anticipated annual indirect cost recovery would be reduced by $8.3 million.

65.     Plaintiff UChicago—a member of AAU and ACE—has 3,258 active NIH awards totaling $1,012,945,241 in award authorizations.  For UChicago's fiscal year that ended June 30, 2024, the university received approximately $338 million in NIH funding, $241 million of which was for direct cost charges, and $97 million for indirect costs. UChicago estimates that based on the new lower indirect cost rate of 15%, it will lose approximately $52 million in reimbursement for indirect costs that support NIH research over the next 12 months.

66.     Plaintiff Cornell—a member of AAU, ACE, and APLU—expended approximately $452 million on 1,693 NIH awards for its 2024 fiscal year, and received $137 million in reimbursement for indirect costs.  Cornell has 1,207 awards from NIH for fiscal year 2025, and estimates that this reduction in the indirect cost reimbursement rate would result in a shortfall of over $42 million for the remainder of this fiscal year alone.  Cornell relies on both the direct cost and the indirect cost portions of funding provided with each NIH award to formulate its overall operating budget in any given year.

67.     Plaintiff GWU—a member of AAU and ACE—is a university located in the District of Columbia.  GWU receives significant federal funds from NIH—approximately $87 million in fiscal year 2024, at an average indirect cost rate of 24% or $21 million.

68.     Plaintiff JHU—a member of AAU and ACE—receives significant federal funding from NIH—approximately $1 billion in FY 2024, at an average indirect cost share of 55% for on-campus organized research, 26% for off-campus organized research, 45.5% for on-campus instruction, 26% for off-campus instruction, 27% for other on-campus sponsored activities, and 15.5% for other off-campus sponsored activities.

69.     Plaintiff MIT—a member of AAU, ACE, and APLU—received a total of approximately $156 million in NIH grant funding for Fiscal Year 2024 for performing sponsored

research, from approximately 400 existing grants and cooperative agreements.  MIT estimates that based on the new lower indirect cost rate, MIT will lose approximately $35 million in reimbursement for costs that support NIH research over the next 12 months, $31 million of which relate to NIH-funded grants (as opposed to cooperative agreements).  MIT has relied on anticipated facilities and administration cost reimbursement for costs associated with building, maintaining, operating, and renewing research buildings; laboratories and equipment; hazardous materials management; radiation safety; and other infrastructure needed to support the research. In addition, MIT's principal investigators have relied on estimated grant funding to develop financial plans for sponsored research projects that frequently span multiple years, and account for payments to research staff and graduate students and for equipment.

70.     Plaintiff Penn—a member of AAU and ACE—receives significant federal funding from NIH—approximately $2.6 billion in currently active funding, at a negotiated indirect cost share of 62.5%.

71.     Plaintiff Rochester—a member of AAU and ACE—receives significant federal funding from NIH—approximately $188 million in fiscal year 2024. If NIH funding grows by 3% in fiscal year 2025, Rochester expects to receive $193 million, but it has not received that much to date and that growth is now jeopardized.  With the implementation of the 15% rate, the payments to Rochester will be reduced by more than $40 million.

72.     Plaintiff Tufts—a member of AAU and ACE—is currently receiving $115.2 million in NIH funding for fiscal year 2025, supporting over 200 projects across the University. Approximately $26.9 million is derived from indirect cost allocations.  The university has relied on indirect cost reimbursement to prepare its operating budget and to invest in biosafety facilities to conduct critical research; to hire staff that protects human and animal subjects involved in

research and properly manages and disposes of chemical and biological agents; and to provide the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

73.     The University of Wisconsin-Madison—a member of AAU, ACE, and APLU— receives a total of $513 million in HHS grant funding, primarily from NIH.  The Guidance's reduction of the university's negotiated indirect cost rate, composed of 26% for administrative costs and 29.5% for facility costs, would eliminate approximately $65 million in annual funding in the current year and subsequent years.

74.     The University of Florida—a member of AAU, ACE, and APLU—expended a total of $328 million in NIH funding in Fiscal Year 2024.  The university's negotiated indirect cost rates are 52.5% applicable for on-campus organized research, 32.6% for on-campus other sponsored activities, 47.5% for on-campus instruction, and 26.5% for off-campus.  That amounts to approximately $100 million in indirect cost recovery on an annual basis.  The university has relied on the well-established process for negotiating indirect cost rates with the government to inform its budgeting and planning.  The Guidance's cuts would reduce this amount by approximately $70 million, to $30 million.

**C.  Prior Attempts to Limit Indirect Cost Rates Governing NIH Grants.**

75.     In 2017, the Administration released a budget proposal that would have slashed the indirect cost rate to 10%.

76.     The proposal spurred widespread criticism and alarm.  And in response, Congress enacted an appropriations rider providing that regulatory "provisions relating to indirect costs . . . including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions

were applied in the third quarter of fiscal year 2017." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740. The appropriations rider also prohibits HHS or NIH from spending appropriated funds "to develop or implement a modified approach to" the reimbursement of "indirect costs" and "deviations from negotiated rates," or to "intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter." *Id.*

77. Congress has repeatedly reenacted this rider. *See* Department of Health and Human Services Appropriations Act, 2019, Pub. L. No. 115-245, § 224, 132 Stat. 2981, 3094; Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 224, 133 Stat. 2534, 2582; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 224, 134 Stat. 1182, 1594; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 224, 136 Stat. 49, 470-71; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 224, 136 Stat. 4459, 4883-84.

78. This rider remains in effect to this day, in the now-operative statute. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677.

**D. NIH's Guidance**

79. On Friday, February 7, 2025, the Office of the Director of NIH issued the Guidance, titled "Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates." The Guidance announced that "[f]or any new grant issued, and for all existing grants to [institutions of higher education, or "IHEs"] retroactive to the date of issuance of this Supplemental Guidance, award recipients are subject to a 15 percent indirect cost rate." It further explained that "[p]ursuant to this Supplemental Guidance, there will be a standard indirect rate

of 15% across all NIH grants for indirect costs in lieu of a separately negotiated rate for indirect

costs in every grant."  The Guidance states it is effective Monday, February 10, 2025.

80.     The Guidance does not acknowledge Congress's statutes prohibiting NIH from

spending appropriated funds to modify the approach to indirect cost rates in effect in 2017.  The

Guidance purports to rely on the authority of 45 C.F.R. § 75.414(c)(1) for its setting of a single,

uniform indirect cost rate of 15%.  But that provision authorizes only "deviation[s]" from the

negotiated rates for "a class of Federal awards or a single Federal award"; it does not authorize

NIH to *entirely eliminate* the institution-specific negotiated rate for *all* federal awards.  45 C.F.R.

§ 75.414(c)(1).  Moreover, to deviate from a negotiated indirect cost rate absent a statutory or

regulatory requirement to do so, NIH must comply with 45 C.F.R § 75.414(c)(3)'s requirement

that the agency "implement, and make publicly available, the policies, procedures, and general

decision-making criteria that their programs will follow to seek and justify deviations from

negotiated rates."  45 C.F.R § 75.414(c)(3).

81.     In addition, pursuant to the regulatory provision that immediately follows, NIH

"must include" such "policies relating to indirect cost rate reimbursement" "in the notice of

funding opportunity."  45 C.F.R § 75.414(c)(4).  Plaintiffs' members' past notices of funding

opportunity did not contain policies issued pursuant to 45 C.F.R § 75.414(c)(3) upon which NIH

now seeks to justify deviations from their negotiated rates to the 15% rate announced in the

Guidance.  Rather, according to NIH, the Guidance itself "implements and makes publicly

available NIH's updated policy deviating from the negotiated indirect cost rate for new grant

awards and existing grant awards, effective as of the date of this Guidance's issuance."

82.     The Guidance also asserts that NIH can apply the new 15% rate to existing IHE

grants.  In putative support of NIH's authority to do so, the Guidance cites Section C.7.a of

Appendix III to Part 75—Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs). As relevant here, Section C.7.a provides: "Except as provided in paragraph (c)(1) of § 75.414[,] Federal agencies must use the negotiated rates for indirect (F&A) costs in effect at the time of the initial award throughout the life of the Federal award." This provision confirms that in order for NIH to deviate in a specific grant from the standard rate that has been negotiated by the cognizant agency for a particular grantee for use by all federal agencies, NIH must comply with the procedures in 45 C.F.R § 75.414(c)(1) and (c)(3)—procedures that must occur *before* an award is granted. Section C.7.a does not authorize NIH to alter the rate for an existing grant.

83.    The Guidance is final agency action under the APA. *See* 5 U.S.C. § 704. The Guidance (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). In particular, the Guidance marks the consummation of NIH's decision-making process because it announces NIH's decision to immediately impose a 15% across-the-board indirect cost rate. And the Guidance is an action by which rights or obligations have been determined or from which legal consequences will flow because it purports to limit the percent of indirect costs for which a grant recipient can be reimbursed under the grant.

**E.  Plaintiffs' Injuries**

84.    The Guidance will have equally immediate, severe, and destructive effects on the members of Plaintiffs AAU, ACE, and APLU, as well as the university Plaintiffs.

85.    For Brandeis, a reduction in the indirect cost rate to 15% would seriously jeopardize all of the NIH-funded research projects conducted at Brandeis. Brandeis would have

to immediately consider reducing or halting a significant portion of its research operations and making reductions in researchers, support staff, and administrators. Brandeis would likely be unable to continue to operate cutting-edge equipment and would also likely be required to either close facilities or operate at reduced schedules with fewer personnel. In the long term, Brandeis would be forced to reduce the number of graduate students it admits and the number of faculty it hires to conduct research. Brandeis cannot cover the funding gap itself, as the majority of its endowment is restricted to donor-designated purposes and it cannot draw on the unrestricted portion without seriously compromising its financial stability. If Brandeis were forced to absorb the cost of a lower indirect cost rate, Brandeis would face long-term budget pressures and would have to reduce key investments and funding for core academic priorities.

86.    For CMU, the Guidance's reduction in indirect cost funding—from approximately $12 million a year to less than $4 million—would have deeply damaging effects on CMU's ability to conduct critical and cutting-edge research. CMU's NIH funding supports research projects aimed at restoring sight to patients with corneal blindness; developing new methods to keep artificial lungs from clotting, benefitting patients dying from chronic lung diseases; relieving symptoms of Parkinson's disease; helping patients with long-term paralysis due to stroke; improving the quality of life for individuals with autism spectrum disorder; developing new methods to treat epilepsy, and creating databases to study communication disorders. An across-the-board 15% indirect cost rate would seriously jeopardize all of these projects and others. CMU relies on the negotiated indirect cost rates to procure the laboratory structures, equipment, maintenance, and facilities required to meet the current requirements of its advanced research, including the construction of the Richard K. Mellon Hall of Sciences, which depends in part on indirect cost funding for its completion. The rate reduction also immediately and necessarily

result in research staffing reductions, including research administrators who ensure that CMU's research efforts comply with regulations governing biosafety, data privacy, and security. More broadly, disruptions to CMU's research would directly harm the Pittsburgh area and the state of Pennsylvania. CMU is one of the largest employers in Pennsylvania, with nearly 6,000 employees in the Pittsburgh area. Its research initiatives catalyze regional and national economic development. CMU cannot cover this funding gap itself, as the majority of its endowment is restricted to specific donor-designated purposes and it cannot draw on the limited unrestricted portion without seriously compromising its financial stability. If CMU were forced to absorb the cost of a lower indirect cost rate, CMU would face long-term budget pressures and would have to reduce key investments and critical activities needed to maintain its academic excellence and contributions to the nation's economic and societal well-being.

87.     Cornell has already budgeted for that funding for its current fiscal year, and does not have sufficient budgeted funds to cover such a sudden structure decrease in indirect cost awards. It would thus be forced to consider layoffs and reductions in administrative costs necessary for research services, closing research facilities, and discontinuing federally funded clinical trials. This would have impacts well beyond the university, which is the largest employer in Tompkins County, New York. And, a reduction in research will impair Cornell's ability to contribute to medical and scientific breakthroughs that provide significant social and economic value to the country as a whole. Cornell cannot make up this funding gap on its own; as a non-profit institution, it does not generate significant surpluses that can be redirected without impacting core academic programs, such as educational programs and financial aid. And it cannot adjust to a lower indirect cost rate going forward without experiencing long-term budget pressure that would require it to invest less in key areas of the university.

88.     For MIT, the immediate short-term effects of reducing the indirect cost rate to 15% would be operating budget reductions and curtailment of capital investments.  MIT is preparing to defer capital projects, including research infrastructure and space renewals and lab equipment installations.  It is also issuing budget cuts by internal units that may be implemented in the form of reduced graduate student admissions, reduction of other employee positions, limiting or deferring facilities investments, and more.  In turn, these actions will directly impact the NIH-funded research being conduct at MIT.  For example, NIH-funded research is working toward critical advancements in detecting lung cancer at an earlier stage, predicting how cancer cells in adults with acute leukemia will respond to different drugs, detecting pre-ovarian cancer lesions, and improving the accessibility, safety, and efficacy of therapeutic intervention for Alzheimer's disease.  Each of these efforts will be severely disrupted by major cuts to research funding.  Moreover, beyond MIT, this reduction in the indirect cost rate will have repercussions for economic development in Cambridge and Massachusetts, including the nearly 14,000 Massachusetts residents employed by MIT, and for MIT's ongoing research partnerships with the Commonwealth of Massachusetts.  MIT cannot make up an increased gap in federal research funding through its institutional endowment.  MIT already matches sponsored research funding nearly dollar-for-dollar with research spending from its endowment and other resources.  It faces significant donor restrictions on its endowment fund, and must manage its endowment to provide support for MIT's costs in perpetuity to sustain cutting-edge research capacity for future generations.

89.     Tufts has already budgeted and structured its financial planning around grant awards with a higher indirect cost rate, which Tufts expected would be sustained throughout the life of the grant.  In the immediate term, the reduced indirect cost rate will result in staffing

reductions, hiring freezes, and potential layoffs. Tufts will also need to immediately begin making decisions as to longer-term investments, including whether it should divert funding to continue appropriate levels of research support for existing projects. And, ultimately, a decrease in Tufts' ability to invest in the infrastructure surrounding its research will affect the businesses that currently support Tufts' physical research infrastructure; threaten the jobs of the over 12,900 New England residents Tufts employees; harm the U.S. economy through decreased potential for valuable innovations; and allow other countries to surpass the United States in critical research. Tufts cannot close this gap on its own because, among other things, its endowment is subject to many donor-designated restrictions and even the portion of the endowment that is unrestricted must be strictly managed to ensure long-term stability for the institution. Nor does Tufts have other budget surplus that it could use to absorb this unexpected funding gap.

90.    The other university Plaintiffs will suffer similar types of harms as a result of the Guidance.

91.    The organizational Plaintiffs' other members will be harmed in similar ways. For the University of Wisconsin-Madison, a loss of approximately $65 million in annual funding will impact the university's ability to draw critical funds used to pay expenses associated with its research enterprise, imperil research space, and negatively and specifically impact the institution's ability to conduct clinical research related to cancer treatment (including pediatric), Alzheimer's Disease and other types of dementia, cardiac conditions, fetal heart conditions, maternal–fetal health, autism, addiction recovery, diabetes, asthma, adolescent and adult depression and post-traumatic stress, infectious diseases, Huntington's Disease, HIV, conditions affecting nursing home patients, veteran's health, and more. In addition, the unanticipated and abrupt loss of $65 million will place the university in the sudden, untenable position of no longer

being able to rely on promised federal funding to support the daily activities and operations that support life-saving clinical and translational research at UW-Madison. If alternative sources of funding cannot be secured to fill this void, the reduction in indirect cost recovery could necessitate programmatic downsizing at the university, including potentially terminating some clinical trials, thereby leaving a population of patients with no viable alternative. Moreover, the University faces submission deadline for grants in the next two to seven days—grants that it must now reconsider pursuing in light of NIH's eleventh-hour cutting of indirect cost rates but that are instrumental in fostering the success of its researchers.

92.    For the University of Florida, the Guidance's reduction in indirect cost funding— from $100 million a year to $30 million—would have deeply damaging effects on the University's ability to conduct research from day one. It will necessarily and immediately result in staffing reductions across the board. It will also create longer term impacts that are both cumulative and cascading, including safety issues from lack of staffing for environmental health and safety, as well as human subject research oversight due to reduction in staffing for the Institutional Review Board that oversees the human subject protections program. Moreover, a massive reduction in the University of Florida's research budget would immediately and seriously jeopardize its contributions to the local region and to the state of Florida. Finally, the University of Florida's biomedical research enterprise includes research in emerging and known pathogens that threaten agriculture, animals, and human life, and disruptions in the University of Florida's research in these areas will place our country and economy at greater risk. Nor can the university cover the funding gap itself: The majority of its endowment is restricted, and the portion that is unrestricted is subject to a carefully managed annual payout to ensure long-term financial stability. As a public university tasked by the state of Florida to carefully steward its

resources, the university reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps.

## CLAIMS FOR RELIEF

### Count I

### Violation of Administrative Procedure Act—Contrary to Law

### (Illegal Departure from Section 224 of Continuing Appropriations Act of FY24)

93.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

94.     The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law.  5 U.S.C. § 706(2)(A).

95.     Section 224 of The Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024 (the Further Consolidated Appropriations Act, 2024, Public Law No. 118-47, div. D, tit. II, 138 Stat. 460, 677) provides: "In making Federal financial assistance, the provisions relating to indirect costs in part 75 of title 45, Code of Federal Regulations, including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017. None of the funds appropriated in this or prior Acts or otherwise made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions, or to intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter."

96.    Congress first enacted this provision in response to the Administration's attempt to impose an across-the-board cut in negotiated rates in 2017.

97.    Subsequent continuing resolutions establish that Section 224 remains in effect:

    a.    The Continuing Appropriations and Extensions Act, 2025, Public Law No. 118-83, 138 Stat. 1524 (2024), made further appropriations through December 20, 2024. Section 106, P. L. 118-83. Regarding "continuing projects or activities . . . that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2024" and were funded by appropriations in The Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024 (Public Law 118-47, div. D), Public Law No. 118-83 specifically appropriated "such amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2024 and *under the authority and conditions provided in such Acts*." Pub. L. No., § 101, 118-83, 138 Stat. 1524, 1524 (emphasis added).

    b.    The Further Continuing Appropriations Act, 2025 (Public Law No. 118-158, div. A) extended the effective date of Public Law No. 118-83 until March 14, 2025. Pub. L. No. 118-158, div. A, § 101, 138 Stat. 1722, 1723.

    c.    Accordingly, Section 224's congressionally imposed limitation on deviations from negotiated rates for indirect costs remains in force.

98.    By radically slashing the recovery rate for indirect costs, the Guidance violates the statutory requirement that the "provisions relating to indirect costs in part 75 of title 45, Code of Federal Regulations, including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same

manner as such provisions were applied in the third quarter of fiscal year 2017." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677.

99.     Further, the appropriations rider specifies that "[n]one of the funds appropriated in this or prior Acts or otherwise made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions, or to intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter." *Id.*

100.    NIH spent appropriated funds enacting the new Guidance and will continue to spend appropriated funds implementing it. The NIH's new policy, contained in the challenged Guidance, is a "modified approach" to the "provisions relating to indirect costs." By spending appropriated funds enacting and implementing that policy, NIH has violated Section 224 and will continue to do so. *Id.*

101.    The NIH's new policy also has the effect of "intentionally or substantially expand[ing] the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter." *Id.* In particular, the "fiscal effect" of the deviation in negotiated rates down to 15% across all projects is vastly greater than the "fiscal effect" of prior deviations, which were unusual, individualized, and program-specific. By spending appropriated funds enacting and implementing a policy that had that effect, NIH has violated Section 224 and will continue to do so.

**Count II**

**Violation of Administrative Procedure Act—Contrary to Law**

**(Appropriations Clause Violation)**

102.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

103.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law.  5 U.S.C. § 706(2)(A).

104.    The Appropriations Clause provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."  U.S. Const. art. I, § 9, cl.  7.  This "straightforward and explicit command . . . means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (internal quotation marks omitted).

105.    As noted above, Congress has provided: "None of the funds appropriated in this or prior Acts or otherwise made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions, or to intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter."  Further Consolidated Appropriations Act, 2024, Public Law No. 118-47, div. D, tit. II, 138 Stat. 460, 677.  The Appropriations Clause therefore forbids NIH from using appropriated funds for implementing a "modified approach" to indirect cost recovery provisions.  It further forbids NIH from expanding the fiscal effect of the approval of deviations from negotiated rates.

106.    By issuing the Guidance, NIH has spent money in a manner Congress has forbidden, in violation of the Appropriations Clause.  And by implementing the Guidance, NIH

will continue to spend money in a manner Congress has forbidden, in violation of the Appropriations Clause.

## Count III

### Violation of Administrative Procedure Act—Contrary to Law

### (Illegal Departure from Negotiated Cost Rates in Violation of 45 C.F.R. 75.414 and NIH Grants Policy Statement)

107.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

108.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law.  5 U.S.C. § 706(2)(A).

109.    45 C.F.R. § 75.414(c)(1) states that negotiated indirect cost rates "must be accepted by all Federal agencies.  An HHS awarding agency may use a rate different from the negotiated rate for a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by a Federal awarding agency head or delegate based on documented justification as described in paragraph (c)(3) of this section."

110.    In turn, 45 C.F.R. § 75.414(c)(3) states: "The HHS awarding agency must implement, and make publicly available, the policies, procedures and general decision making criteria that their programs will follow to seek and justify deviations from negotiated rates."

111.    By pronouncing a single, uniform "policy" setting indirect cost rates at 15% regardless of the otherwise applicable negotiated rate, NIH violated 45 C.F.R. § 75.414(c)(1) and (c)(3).  These provisions authorize NIH to announce *procedures* governing *subsequent* decisions to make *individualized* deviations from the baseline negotiated rate.  They do not authorize NIH to make a unilateral decision to wipe out all negotiated rates for all universities.

a. Section 75.414(c)(1) provides the general rule that "[n]egotiated [indirect cost] rates must be accepted." That principle is echoed in Section 7.4 of the Policy Statement, which provides that "[i]f a subrecipient already has a negotiated indirect cost rate established with their cognizant agency for indirect cost, the negotiated rate must be used." Policy Statement at IIA-69. Section 75.414(c)(1) then specifies that when the requirements of § 75.414(c)(3) are met, NIH may use a "different" rate only for either "a class of Federal awards or a single Federal award." These provisions contemplate that the negotiated cost rates will be the baseline, and that a *subset* of awards—a "class" of awards or even a "single" award—may be subject to departure from that baseline. They do not permit a single across-the-board rate cut for all awards.

b. Similarly, Section 75.414(c)(3) provides that "[t]he HHS awarding agency must implement, and make publicly available, the policies, procedures *and* general decision making criteria that their programs will follow to seek and justify deviations from negotiated rates." 45 C.F.R. § 75.414(c)(3) (emphasis added). The plain text of this provision requires NIH to enact three different things— policies, procedures, *and* general decision-making criteria. Here, NIH enacted one thing—a single, uniform "policy" setting indirect cost rates at 15% across the board. The plain text of this provision also states that NIH *will* follow those policies, procedures, and criteria *to seek and justify* deviations. In other words: first the policies, procedures, and criteria will be enacted, and then NIH will use them to seek and justify deviations from the negotiated baseline. NIH skipped the first step: it never enacted any policies, procedures, or criteria that it would

subsequently rely upon to "seek" or "justify" changes to the baseline. It just set rates at 15% across the board.

c.   Reinforcing the point, Section 75.414(c)(3) authorizes "deviations" from negotiated rates." A "deviation" is a "departure from a standard or norm." *Deviation*, Dictionary.com, https://www.dictionary.com/browse/deviation. And authority to provide for "deviations" does not empower NIH to eliminate the standard use of negotiated rates; rather, negotiated rates must remain the norm, with deviations just narrow exceptions. *Cf. MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994) (holding that statutory authority to "modify" a requirement "does not contemplate fundamental changes"); *Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (similar).

112.   Section 7.4 of the Policy Statement provides: "Regardless of the type of recipient, the rate(s) in effect at the beginning of the competitive segment will be used to determine the amount budgeted for F&A costs for each year of the competitive segment." Policy Statement at IIA-69. Further, "F&A cost reimbursement on grants to IHEs is based on the rates used in the award, which are not subject to adjustment in reimbursement except for the establishment of permanent rates when a provisional rate was used for funding (See 2 CFR 200 Appendix III Section C(7)(b))." *Id.* The abandonment of the negotiated rate violates this requirement.

113.   The illegality of NIH's new policy is especially egregious with respect to existing grants. Section 75.414(c)(4) states: "As required under § 75.203(c), the HHS awarding agency must include in the notice of funding opportunity the policies relating to indirect cost rate reimbursement, matching, or cost share as approved." The Federal Register notice promulgating the provision on which Section 75.414(c) is modeled makes clear that any attempt to depart from

negotiated rates must first be "established" and then "inclu[ded] . . . in the announcement of funding opportunity." 78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013). That did not occur here: the "notice of funding opportunity" applicable to Plaintiffs' existing grants did not include HHS's new policy, and HHS cannot retroactively alter existing grant agreements.

114.    Section C.7.a of Appendix III, which the Guidance cites, does not support the Guidance's unlawful approach. That provision states in relevant part: "Except as provided in paragraph (c)(1) of § 75.414[,] Federal agencies must use the negotiated rates for indirect (F&A) costs in effect at the time of the initial award throughout the life of the Federal award. Award levels for Federal awards may not be adjusted in future years as a result of changes in negotiated rates." As this language reflects, the general rule is that the government-wide negotiated rate for a particular grantee that is in effect at the beginning of an award applies throughout the life of the award, even if that government-wide negotiated rate is renegotiated by a cognizant agency during the life of the award. The "except[ion]" is when a different rate from the government-wide negotiated rate is set via the procedures in § 75.414(c)(1). Pursuant to § 75.414(c)(1), (c)(3), and (c)(4), a deviation based on "approv[al] by a Federal awarding agency head" must occur when the grant is being negotiated, not in the middle of an existing grant. Section C.7.a does not authorize a change for awards that NIH has already approved and upon which a grantee has already relied.

## Count IV

### Violation of the Administrative Procedure Act – Arbitrary and Capricious

115.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

116.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

117.    The Guidance is arbitrary and capricious for many reasons.

118.    Indirect costs are critical to supporting and maintaining world-class research. Cutting-edge medical and health research, for example, requires physical infrastructure and equipment, animal facilities, ethics review boards, and many other costs that are not traceable to specific grants but are nonetheless essential for the work.  The Guidance ignores this problem. The agency suggests that "as many funds as possible" should "go towards direct scientific research costs rather than administrative overhead," but it does not rationally explain how taking funding away from indirect costs—which are, again, necessary for the work—will achieve the Guidance's stated goal of ensuring "the best medical research in the world."  The Guidance does not mention the consequences for institutional research, and it provides no rational explanation for how handicapping life-saving research serves to "benefit the American people and improve their quality of life."  Nor does it consider that the across-the-board 15% rate amounts to a decision to fund only part of the costs of research NIH supports, and ultimately amounts simply to a decision to fund less research of particular types—including research that relies heavily on expensive overhead, as cutting-edge research often does.

119.    The Guidance suggests that the lower indirect cost rates provided by private foundations justify NIH's new policy.  This justification is not rational and ignores fundamental differences between federal research funding and private philanthropy.

    a.    First, when a private foundation offers a grant with a low indirect cost rate, an institution may be more able to accept those terms because of the other grants—

including from NIH—that it already receives.  NIH's justification thus ignores the fact that the very system it seeks to dismantle is what allows lower indirect cost rates from private foundations to be possible in the first place.

b.  Second, private foundations are not bound by the same administrative requirements as federal agencies.  As such, private grants typically do not impose substantial compliance requirements, auditing obligations, and other administrative requirements for grant recipients.

c.  Third, grants from private foundations may focus on specific research areas or particular types of projects which, by their nature, have lower overhead costs.  By contrast, NIH supports broad-based research infrastructure, which makes higher overhead expenses impossible to avoid.

d.  Fourth, private foundations may define and calculate indirect costs differently from NIH.  For example, the Gates Foundation explained in 2017 that it "is more expansive than NIH in defining direct costs, meaning some overhead payments are wrapped in with the grant."[5]

e.  Fifth, the indirect cost limits imposed by private foundations may be driven by considerations entirely irrelevant to the federal government, including donor restrictions.

120.  The Guidance is arbitrary and capricious because NIH fails to explain why its own audits of indirect costs would not accomplish the task of preventing administrative waste that it invokes in the Guidance.

---

[5] Jocelyn Kaiser, *NIH Plan to Reduce Overhead Payments Draws Fire*, Science (June 2, 2017), https://www.science.org/content/article/nih-plan-reduce-overhead-payments-draws-fire.

121.    The Guidance is also arbitrary and capricious because it ignores the reliance interests of the research institutions receiving federal funding and does not provide an explanation that accounts for those reliance interests.  Typically, about 30% of an average NIH grant is for indirect costs, but institutions engaged in the most cutting-edge research, with the highest overhead, often have higher-than-average indirect cost rates.  The Guidance thus purports to slash indirect cost recovery by at least half.  With regard to existing grants, the reliance interests are obvious: budgets have already been determined and research benefitting from the funding has already started.  But even with respect to new grants, universities have structured their budgetary affairs on the understanding that federal agencies will follow through by paying their legally required cost reimbursement using the longstanding practice of using negotiated indirect costs and rates.  Universities have accordingly made costly decisions about long-term investments, such as what physical infrastructure should be built, in reliance on negotiated rates with federal agencies allowing for the recovery of some such costs via depreciation, as well as the OMB and HHS regulations generally requiring NIH to use a negotiated indirect cost rate and permitting deviations from that rate only in narrowly limited circumstances.

122.    The Guidance is arbitrary and capricious because it reflects a new policy resting upon factual findings that contradict those which underlay NIH's prior policy and that are also wrong.  NIH's prior policy rested on the view that a uniform indirect cost rate was not appropriate, and that negotiated rates should be both institution-specific and—in most cases—substantially higher.  The Guidance provides no explanation for this reversal in course.  In addition, the Guidance is premised on misleading comparisons of non-equivalent data.  For example, the Guidance states that the "average indirect cost rate . . . has averaged between 27% and 28% over time," with "many organizations [being] much higher—charging indirect rates of over 50% and

in some cases over 60%." The first figure, however, represents a per-institution average, while the latter figures represent isolated instances of negotiated rates. They are not comparable or an appropriate premise from which to extrapolate the Guidance's rule.

123.    The Guidance is arbitrary and capricious because in setting a uniform 15% rate, it ignores the dramatic variations in need and circumstances among different institutions across the country. Some laboratories, for example, are more expensive to maintain than others, depending on their location, the work they focus on, and the needs of the projects housed there. A one-size-fits-all approach to indirect cost rates, which ignores these variations, is irrational.

124.    Accordingly, the Guidance is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

## Count V

### Violation of Administrative Procedure Act—Contrary to Law

### (Illegal Departure from Cost Recovery Regulations and Policy Guidance)

125.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

126.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

127.    Federal regulations and decades of executive branch practice establish substantive and procedural guidelines governing the recovery of indirect costs, which NIH's Guidance blatantly violates.

128.    Substantively, HHS regulations dictate that grantees will recover the actual indirect costs that are reasonable and allocable to federal projects.

d.    The bedrock principle is: "The total cost of a Federal award is the sum of the allowable direct and allocable indirect costs less any applicable credits." 45 C.F.R. § 75.402.

e.  HHS regulations establish detailed guidelines designed to ensure that grantees recover their actual allocable indirect costs. *See generally* 45 C.F.R. § 75.414; Appendix III to Part 75—Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs).

129.  By slashing indirect cost rates to 15%, NIH will prevent grantees from recovering their indirect costs.

130.  NIH's guidance does not even purport to adhere to the principle that grantees should recover their indirect costs. Instead, it assigns an arbitrary 15% indirect cost recovery rate across all institutions simply because NIH has unilaterally decided that institutions should be getting less money and, indeed, should bear the cost of an unstated new cost-sharing obligation that was not disclosed when the applicable grant terms were executed and the budget was prepared for and approved by NIH.

131.  Procedurally, federal regulations prescribe a complex process for negotiating an indirect cost recovery rate.

f.  Institutions must document and submit costs in painstaking detail to support that process. Subpart E of part 75 of Title 45 "establishes principles for determining the allowable costs incurred by non-Federal entities under Federal awards." 45 C.F.R. § 75.100(c). 45 C.F.R. § 75.414(e) stipulates that a set of appendices will set forth in detail "[r]equirements for development and submission of indirect (F&A) cost rate proposals and cost allocation plans." Those appendices contain "the documentation prepared by a non-Federal entity to substantiate its request for the establishment of an indirect cost rate." 45 C.F.R. § 75.2 (definition of "Indirect cost rate proposal"). For universities, Appendix III establishes the criteria for

identifying and computing indirect facilities and administration costs for Institutions of Higher Education (IHEs).  *Id.* § 75.414(e)(1); Appendix III to Part 75—Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs).  The Appendix details the processes for a grant recipient to document a significant range of costs and how those costs should be allocated among multiple government projects.

g.   Audits are the mechanism then used to determine what is charged to a federal award.  45 C.F.R. § 75.501(b) requires that a "non-Federal entity that expends $750,000 or more during the non-Federal entity's fiscal year in Federal awards must have a single audit conducted in accordance with § 75.514," except if it elects to have a program-specific audit.  This audit is performed annually, and it must be conducted in accordance with articulated standards.  45 C.F.R. §§ 75.504, 75.514. An auditor may identify any "questioned cost," which is defined as "a cost that is questioned by the auditor because of an audit finding: (1) [w]hich resulted from a violation or possible violation of a statute, regulation, or the terms and conditions of a Federal award, including for funds used to match Federal funds; (2) [w]here the costs, at the time of the audit, are not supported by adequate documentation; or (3) [w]here the costs incurred appear unreasonable and do not reflect the actions a prudent person would take in the circumstances."  45 C.F.R. § 75.2 (definition of "Questioned cost").  The results of the audit and any questioned costs are factored into negotiation of indirect cost rates.  *See* Appendix III to Part 75— Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs).

132.    Likewise, the NIH Grants Policy Statement stipulates that rates must be "negotiated by [a certain NIH office], or other agency with cognizance for F&A/indirect cost rate (and other special rate) negotiation."  Policy Statement at IIA-68.

133.    NIH ignored that detailed process.  Instead, it arbitrarily determined that all institutions would recover at a 15% rate, rendering that entire regulatory process meaningless.

## Count VI

## Violation of the Administrative Procedure Act – Failure to Observe Required Procedures

134.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

135.    The APA requires notice and opportunity for comment prior to agency rulemaking that has the "force and effect of law."  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quotation marks omitted); 5 U.S.C. § 553(b), (c).

136.    The Guidance is a rule with the force and effect of law because it "effectively amends" existing rules with respect to indirect cost rates under NIH grants.  *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).  As alleged above, under the existing HHS regulations, negotiated indirect costs rates are legally binding on all federal agencies, and deviations on an individualized basis are only allowed pursuant to the procedures set forth in 45 C.F.R. § 75.414.  Rather than following those procedures here, Defendants issued a blanket legislative rule purporting to adjust all indirect cost rates for every grant recipient to 15%.  This action represents "a new position inconsistent with" the existing regulatory and legislative regime governing NIH grants, and it is thus subject to mandatory notice-and-comment procedures.  *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995).

137.    The Guidance is clear that it is not purporting to interpret existing statutes or regulations, but rather seeks to effect a substantive change in the law.  The Guidance states that it "*implements* and makes publicly available NIH's *updated* policy deviating from the negotiated indirect cost rate for new grant awards and existing grant awards, effective as of the date of this Guidance's issuance." (emphasis added).  It further states that, "*[p]ursuant to this Supplemental Guidance*, there will be a standard indirect rate of 15% across all NIH grants for indirect costs in lieu of a separately negotiated rate for indirect costs in every grant."  (emphasis added).  These statements indicate that this Guidance purports to create new legal obligations, which can only be accomplished after providing notice and opportunity for comment.

138.    HHS has previously recognized that similar changes are subject to the rules generally requiring notice and comment.  Prior rate restrictions implemented by HHS (and by OMB) have been implemented in the regulations through the notice-and-comment rulemaking process.  *See* Health and Human Services Grants Regulation, 81 Fed. Reg. 45,270, 45,271 (July 13, 2016) (addressing HHS restriction of training grants, foreign organizations, and foreign public entities to a maximum 8% indirect cost rate); *see also* Proposed Revisions to Circular A-21, 56 Fed. Reg. 29,530, 29,530 (June 17, 1991) (OMB proposal to impose cap of 26% cap of modified total direct costs as reimbursement for administrative costs); Revisions to Circular A-21, "Cost Principles for Educational Institutions," 56 Fed. Reg. 50,224 (Oct. 3, 1991) (finalizing the proposed revision and summarizing almost 300 comments).

139.    Similarly, when HHS recently adopted amendments to the uniform regulation governing federal grants at 2 C.F.R. Part 200, it asserted that there is "good cause under 5 U.S.C. [§] 553(b)(B) … to dispense with the opportunity for advance notice and for public comment" and to make the amendments immediately effective.  *See* Health and Human Services Adoption

of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 Fed. Reg. 80,055, 80,056 (Oct. 2, 2024). But, here, NIH has neither engaged in notice and comment nor asserted that any good cause justified a failure to engage in notice and comment. Nor could good cause exist for making such a disruptive change effective immediately.

140.    NIH failed to provide notice and an opportunity to comment on the Guidance in a timely manner, in violation of the required procedures under the APA. *See* 5 U.S.C. § 553.

## Count VII

### Violation of Administrative Procedure Act—Contrary to Law

### (Violation of Public Health Service Act)

141.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

142.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

143.    NIH has congressionally delegated authority to award research grants pursuant to Section 301(a) of the Public Health Service Act, as amended. *See* 42 U.S.C. § 241(a). Specifically, Section 301(a) authorizes the agency to "make grants-in-aid to universities" and other research institutions for the purpose of "promot[ing] the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man." *Id.*

144.    As alleged above, however, this Guidance is likely to have devastating effects across the country, not only on the research institutions themselves but also the millions of people who benefit from and depend on the medical and scientific research that will be crippled by the Guidance.

145.     More fundamentally, the Supreme Court has underscored that agencies may not enact sweeping rules of this sort without express congressional authorization.  In considering whether agency action is authorized by statute, courts consider whether the "history and breadth of the authority that [the agency] has asserted" and the "economic and political significance of that assertion" counsel in favor of "hesitat[ing] before concluding that Congress meant to confer such authority."  *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotation marks omitted) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)). Here, no Act of Congress expressly authorizes NIH to devastate American medical research by enacting a radical change from institution-specific negotiated rates to a single across-the-board rate.  Thus, under the major questions doctrine, NIH cannot impose such a change unilaterally. Indeed, Congress has said the exact opposite:  When the executive branch tried this maneuver once before, Congress reacted promptly and emphatically to make clear that this deviation was contrary to Congress' will.  For NIH to cast that congressional judgment aside, with no warning whatsoever and without even bothering to mentioning the federal statute that expressly barred it from doing what it did, is a gross violation of bedrock principles of administrative law.

146.     Because Congress did not expressly authorize the NIH to obliterate medical research at America's great research universities, the Guidance is invalid.

### Count VIII

### Violation of Administrative Procedure Act—In Excess of Statutory Authority

### (Retroactivity)

147.     Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

148.     The APA directs courts to hold unlawful and set aside agency actions that are in excess of statutory authority.  5 U.S.C. § 706(2)(C).

149.    "[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

150.    The Guidance is a retroactive action because it "impair[s] rights a party possessed when [it] acted, increase[s] a party's liability for past conduct, [and] impose[s] new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

151.    Congress did not authorize NIH to retroactively modify indirect cost rates when it enacted NIH's grantmaking authority, or in any other statute.  *See* 42 U.S.C. § 241.  NIH's assertion that the change affects only "go forward expenses" does not cure this violation, because the reduced rate necessarily undermines project budgets that were previously approved and upsets institutions' commitments made in reliance upon those budgets.  In fact, as explained above, Congress has precluded NIH from undertaking the Guidance's abrogation of negotiated indirect cost rates.

152.    Because NIH's retroactive action is in excess of its statutory authority, the Guidance is invalid.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.   Vacatur of the Guidance;

b.   Declaratory judgment finding the Guidance procedurally invalid, arbitrary and capricious, and contrary to law;

c.   An injunction preliminarily and permanently prohibiting Defendants, their agents,

and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Guidance in any form; from otherwise modifying negotiated indirect cost rates except as permitted by statute and by the regulations of OMB and HHS; and from expending appropriated funds in any matter contrary to Section 224 of the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 677;

d.  An order awarding Plaintiff's costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law;

e.  Any such further relief as the Court deems equitable, just, and proper.

[signatures on following page]

Dated: February 10, 2025

JENNER & BLOCK LLP

By: */s/ Shoba Pillay*

Shoba Pillay, BBO No. 659739
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha (*pro hac vice pending*)
Lindsay C. Harrison (*pro hac vice pending*)
Lauren J. Hartz (*pro hac vice forthcoming*)
Elizabeth Henthorne (*pro hac vice
forthcoming*)
Zachary C. Schauf (*pro hac vice forthcoming*)
Adam G. Unikowsky (*pro hac vice
forthcoming*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
BHenthorne@jenner.com
ZSchauf@jenner.com
AUnikowsky@jenner.com

*Attorneys for All Plaintiffs*

Respectfully submitted,

CLEMENT & MURPHY, PLLC

By: */s/ Paul D. Clement*

Paul D. Clement (*pro hac vice pending*)
Erin E. Murphy (*pro hac vice pending*)
James Y. Xi (*pro hac vice pending*)
Kyle R. Eiswald (*pro hac vice pending*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@glementmurphy.com

*Attorneys for Association of American
Universities, Association of Public and Land-
grant Universities, and American Council on
Education*